UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

VINCENT MARINELLO           :        DOCKET NO. 15-cv-1496
   D.O.C. # 547671

VERSUS                    :        JUDGE DOHERTY

N. BURL CAIN              :        MAGISTRATE JUDGE KAY

## REPORT AND RECOMMENDATION

Before the court is a pro se application for a writ of habeas corpus pursuant to 28 U.S.C § 2254, filed by Vincent Marinello ("petitioner") [doc. 1]. The petitioner is a prisoner in the custody of the Louisiana Department of Public Safety and Corrections. He is currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. N. Burl Cain, former warden, opposes the application. Doc. 19.

This matter is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons **IT IS RECOMMEDED** that the application be **DENIED**.

## I.
### BACKGROUND

### A. Conviction

On December 7, 2006, the petitioner was indicted in the Twenty-Fourth Judicial District, Jefferson Parish, Louisiana, on one count of second degree murder. Doc. 20, p. 99. The charge related to the August 31, 2006 shooting death of his estranged wife, Mary Elizabeth "Liz" Marinello ("victim"). *Id.*; *State v. Marinello*, 49 So.3d 488, 490 (La. Ct. App. 3d Cir. 2010). The

petitioner was a broadcast journalist in the New Orleans area. *See* doc. 23, pp. 139–41. At the time of the murder petitioner had decades of experience as a sports journalist on local television and radio and was also providing radio news coverage in the wake of Hurricane Katrina. *Id.*

On January 15, 2008, the defense sought a change of venue on the basis of extensive pre-trial publicity with "[m]embers of the press . . . present during and [reporting] on each and every hearing in this matter, including the most mundane routine status hearings." Doc. 20, att. 1, pp. 125–26. The defense's motion for change of venue was granted and the case was transferred to the Fifteenth Judicial District, Lafayette, Louisiana. Doc. 20, att. 1, p. 217.

Following a jury trial, the petitioner was convicted of the charged offense on December 13, 2008. Doc. 21, att. 1, p. 260. The trial court then imposed a mandatory life sentence. *Marinello*, 49 So.3d at 490.

### B. Direct Appeal

The petitioner filed an appeal in the Louisiana Third Circuit Court of Appeal, raising several assignments of error through counsel. Relevant to the instant petition is the following:

> The trial court erred in permitting the prosecution to introduce alleged other bad acts and uncharged offenses. The court also erred in allowing prosecution witness Gwen Hanhart to testify as to the personal advice she gave her divorce clients. Further, the prosecution's closing argument and rebuttal argument unduly highlighted this improperly admitted evidence and the requested mistrial should have been granted. Admission of this highly prejudicial evidence violated Appellant's right to a fair trial guaranteed to him by U.S. Const. Amend. 5 & 6 and La. Const. Art. I, § 16.

*Id.* at 491–92. The Third Circuit reviewed this claim on the merits and denied relief. *Id.* at 499–503. The petitioner then sought review in the Louisiana Supreme Court, which denied same on March 25, 2011. *State v. Marinello*, 61 So.3d 660 (La. 2011). He did not seek review in the United States Supreme Court. Doc. 1, p. 3.

### C.   State Collateral Review

The petitioner filed an application for post-conviction relief on June 7, 2012.[1] Doc. 23, att. 2, p. 157. There he raised the following claims:

1. Ineffective assistance of counsel, based on numerous alleged deficiencies by trial counsel.

2. A Louisiana rule of evidence, LA. CODE EVID. ART. 404(B), is unconstitutional where it allows evidence of unadjudicated "other crimes" to be submitted in the trial proceedings, suggesting a finding of guilt on those unadjudicated crimes, on a lesser standard than required by the Constitution or for criminal convictions.

*Id.* at 29–154. The trial court denied the petitioner's request for an evidentiary hearing, ruled that the second claim was not a proper basis for post-conviction relief under LA. CODE CR. P. art. 930.3, and otherwise denied the application on the merits. *Id.* at 4–11. The petitioner sought review in the Third Circuit, also raising the trial court's failure to grant an evidentiary hearing. Doc. 1, att. 6, pp. 61–92; doc. 1, att. 7, pp. 1–77. The Third Circuit affirmed the trial court's ruling. Doc. 1, att. 7, p. 78. The petitioner then sought review in the Louisiana Supreme Court but that was denied on April 17, 2015. *State ex rel. Marinello v. State*, 168 So.3d 393 (La. 2015).

### D.   Federal Habeas Petition

The instant petition was filed on April 29, 2015. Doc. 1, p. 11. The petitioner raises the following claims for relief[2]:

1. Defense counsel rendered ineffective assistance prior to, during, and after trial.

2. A Louisiana rule of evidence, LA. CODE EVID. ART. 404(B), is unconstitutional where it allows evidence of unadjudicated "other crimes" to be submitted in the trial proceedings, suggesting a finding of

---

[1] Under Louisiana law a pleading by a pro se inmate is considered filed, and so its timeliness is calculated *infra*, from the date the inmate delivers the papers to prison authorities for submission. *Stoot v. Cain*, 570 F.3d 669, 671–72 (5th Cir. 2009). The petitioner signed the application on June 4, 2012. Doc. 23, att. 1, p. 154. However, he does not indicate when the application was delivered for mailing. Accordingly, we use the actual date of filing in the trial court.

[2] In his reply the petitioner also raises several challenges to the factual background, which appear to relate to his state court sufficiency of evidence claim. *See* doc. 27. However, he never renewed that claim in his federal petition. Accordingly, it is not within the scope of our review.

guilt based on those unadjudicated crimes, on a lesser standard than that required by the Constitution.

3. The state court erred in failing to grant Mr. Marinello an evidentiary hearing on his application for post-conviction relief.

Doc. 1, att. 1, p. 1.

## II.
### LEGAL STANDARDS ON HABEAS REVIEW

### A. Timeliness

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This period generally runs from the date that the conviction becomes final. 28 U.S.C. § 2244(d)(1)(A). The time during which a properly-filed application for post-conviction relief is pending in state court is not counted toward the one-year limit. 28 U.S.C. § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n. 1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and the filing of the federal habeas application. *Mayle v. Felix*, 545 U.S. 644, 644 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d) the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the instant petition was filed.

### B.  Procedural Default and Exhaustion of State Court Remedies

Before proceeding to the merits of the issues raised in the petition, this court considers the doctrines of procedural default and exhaustion of state court remedies. Exhaustion and procedural default are both affirmative defenses that may be waived by the state if not raised in its responsive pleadings. *See, e.g.*, *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994). However, the federal district court may also consider both doctrines on its own motion. *Magouirk v. Phillips*, 144 F.3d 348, 357–59 (5th Cir. 1998). Therefore we consider any claims by respondent under these doctrines, in addition to conducting our own review.

### 1.  Exhaustion of State Court Remedies

The federal habeas corpus statute and decades of federal jurisprudence require a petitioner seeking federal habeas corpus relief to exhaust all available state court remedies prior to filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734, 740–41 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts "in a procedurally proper manner according to the rules of the state courts." *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *E.g.*, *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir. 1987). Exhaustion is not satisfied if the petitioner presents new legal theories or entirely new factual claims in support of his federal habeas petition. *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983).

In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a). Thus, in order for a Louisiana prisoner to have exhausted his state court remedies he must

have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner, supported by the legal theories and factual allegations that he raises now. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

### 2.  *Procedural Default*

When a petitioner has defaulted a claim by violating a state procedural rule which constitutes adequate and independent grounds to bar direct review in the United States Supreme Court, he may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 111 S.Ct. 2546, 2554 (1991). Failure to satisfy state procedural requirements results in forfeiture of a petitioner's right to present a claim in a federal habeas proceeding. *Murray v. Carrier*, 106 S.Ct. 2639 (1986). This is not a jurisdictional matter; rather, it is grounded in concerns of comity and federalism. *Trest v. Cain*, 118 S.Ct. 478, 480 (1997).

Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default)[3] or (2) the petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is considered to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). The grounds for procedural default must be based on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989).

---

[3] To serve as adequate grounds for a federally cognizable default the state rule "must have been firmly established and regularly followed by the time as of which it is to be applied." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (internal quotations omitted).

### C. *General Principles*

When a state court adjudicates a petitioner's claim on the merits, this court reviews the ruling under the deferential standard of 28 U.S.C. § 2254(d). *Corwin v. Johnson*, 150 F.3d 456, 471 (5th Cir. 1998). A writ of habeas corpus shall not be granted unless the state court's adjudication on the merits resulted in a decision that was either (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. A petitioner must demonstrate that the "fair import" of the state court decision shows that the court failed to apply the controlling federal standard. *Early v. Packer*, 123 S.Ct. 362, 365 (2002) (per curiam). Furthermore, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011). A decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedents and arrives at a [contrary] result . . . ." *Bell v. Cone*, 125 S.Ct. 847, 851 (2005) (internal quotations omitted).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination but rather he must demonstrate that the factual determination was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] state-court factual determination

is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Rather, the petitioner has to show that "a reasonable factfinder must conclude" that the determination of facts by the state court was unreasonable. *Rice v. Collins*, 126 S.Ct. 969, 975 (2006).

### III.
#### LEGAL ANALYSIS

As a preliminary matter this court reviews the petitioner's application for timeliness, failure to exhaust state court remedies, and procedural default. If the claim is procedurally viable, its merits are considered under the general standards set forth in Section II.C.

### A. Timeliness

Here the petitioner's conviction became final on June 24, 2011, when his time for seeking review in the United States Supreme Court expired. *See* Sup. Ct. R. 13. Accordingly, **349 days** accrued before his time limit was tolled by filing an application for post-conviction relief on June 7, 2012. The time limit remained tolled until the Louisiana Supreme Court's judgment on April 17, 2015, allowing an additional **12 days** to accrue before the instant petition was filed on April 29, 2015. Thus **361 days** have run against the petitioner's 365 day limit, making the instant petition timely.

### B. Exhaustion of State Court Remedies and Procedural Default

All of the claims raised here were exhausted in the state courts. However, as the respondent points out, the claim relating to Article 404(B)'s constitutionality was not adjudicated on the merits but instead denied on procedural grounds.[4] The petitioner offers no grounds for excusing the

---

[4] The petitioner raised a similar claim on his direct appeal, but only alleged that Article 404(B) was unconstitutionally applied in his case. He did not raise a direct challenge to the article's constitutionality. *See* doc. 1, att. 2, pp. 71–80. Accordingly, even though that claim was adjudicated on the merits, it is not sufficient to prevent a procedural default here.

default, such as cause and prejudice or miscarriage of justice. Accordingly, the second claim is procedurally defaulted and will not be considered here.

The remaining claims were decided on the merits and are thus cognizable in this court's review.

### C. Substantive Analysis

Having determined which claims are properly before this court, we now review each under the standards enunciated above.

#### 1. Ineffective assistance of counsel

Claims of ineffective assistance of counsel are gauged by the guidelines set forth by the Supreme Court in *Strickland v. Washington*, 104 S.Ct. 2052 (1984). Under *Strickland*, a petitioner must demonstrate: (1) that his counsel's performance was deficient, requiring a showing that the errors were so serious such that he failed to function as "counsel" as guaranteed by the Sixth Amendment, and (2) that the deficiency so prejudiced the defendant that it deprived him of a fair trial or of a dependable verdict.  *Id.* at 2064. This standard does not require perfect assistance by counsel; rather, petitioner must demonstrate that counsel's representation fell beneath an objective standard of reasonableness. *Id.* Judges have been cautioned towards deference in their review of attorney performance under *Strickland* claims in order to "eliminate the potential distorting effect of hindsight." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997) (quoting *Strickland*, 104 S.Ct. at 1065). The resulting prejudice must also be so great that it creates a substantial likelihood of a different result. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). A petitioner must meet both of *Strickland*'s prongs in order to show a basis for federal habeas relief. *Id.*

Here the petitioner claims ineffective assistance based on several alleged deficiencies by trial counsel. We review each one under the standard above.

### a. *Failure to perform pretrial discovery and investigation and failure to present a defense*

The petitioner's first two claims of deficient performance arise from counsel's alleged failure to perform pretrial discovery and investigation and failure to present a defense.[5] Given that these claims overlap, we consider them together.

In support of these claims, the petitioner first alleges that counsel neglected to investigate the petitioner's claim that he could not have been at the crime scene. Evidence adduced at trial showed that the victim was shot in the parking lot of the Metairie Towers Office Building at approximately 3:57 pm. *Marinello*, 49 So.3d at 490. The petitioner's cell phone records placed him in the vicinity of Fluker, Louisiana, at 5:16 pm.[6] *Id.* at 495. The petitioner maintains that he could not have murdered his wife at that time and then arrived in Fluker by 5:16 pm. He asserts that trial counsel could have refuted the prosecution's theory of the case by making a thorough investigation of traffic flow patterns and the travel timeline.

At trial Captain Maggie Pernia of the Jefferson Parish Sheriff's Office testified that she was able to make the same journey on the Friday after Thanksgiving in one hour and twelve minutes.[7] Doc. 22, att. 1, pp. 119–21. To refute Pernia's statements the petitioner submitted several affidavits from friends of his who stated that they had attempted the same trip as Pernia and were unable to reach the destination in the same amount of time. Doc. 23, att. 2, pp. 161–73, 176–77. One of these friends, David Daniels, is a structural engineer at Lockheed-Martin and was then

---

[5] Under these claims the petitioner alleges that counsel failed to investigate and interview witnesses from Metairie Academy for Advanced Studies. This claim overlaps with another ineffective assistance claim relating to investigator Frank Mistretta. Accordingly, we handle it below. He then alleges that counsel was ineffective for failing to investigate an alternate suspect theory involving Peter Caruso. This claim is repeated within the petitioner's brief and is thus handled in full below.

[6] Fluker is a town located en route from the New Orleans area to the Jackson, Mississippi area, where the petitioner testified he had traveled and where cell tower records logged his whereabouts on the evening after the murder. *See Marinello*, 49 So.3d at 494–96.

[7] As the murder occurred on the Thursday before Labor Day, the test drive appears scheduled to account for holiday traffic patterns.

assigned to a space shuttle program as lead designer. *Id.* at 161. He submitted an additional affidavit, stating that "[a]fter several studies of routes and travel times," it was his

> professional opinion as an engineer that . . . it is highly improbable, perhaps bordering on impossible, that Vince Marinello could have left the crime scene at 4:10 p.m., battled the holiday rush hour traffic, to arrive in Fluker, Louisiana at 5:16 p.m.

*Id.* at 174–75.

As the trial court ruled in the collateral proceeding, this evidence is insufficient to show that a traffic study would have been beneficial to the petitioner's case. There is no indication of the expertise of any affiant in traffic flow or travel time. Even though Daniels asserts his "professional opinion as an engineer" and bases this opinion on "several studies," he does not state how his training gives him any special proficiency in the matter on which he offers an opinion.

The petitioner next alleges that counsel was ineffective for failing to investigate and present evidence that he could not ride a bicycle, as video evidence and eye witness testimony showed the shooter doing, due to certain physical infirmities.[8] He states that he informed counsel that his treating physician, Dr. Gloria Leary, could substantiate this through testimony and medical records.

To prove an ineffective assistance claim based on uncalled witnesses, a petitioner must show 1) that the testimony would have been favorable and 2) that the witness would have testified at trial. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Here the petitioner does not provide any copy of the records or indication of Leary's availability or willingness to testify to these infirmities.

---

[8] Witnesses informed police that a man had been seen dressed in unseasonably warm clothing and riding a bicycle in the vicinity of the crime scene immediately before the murder and in the preceding days. *Marinello*, 49 So.3d at 491, 493–94. The prosecution presented video surveillance footage, showing a man who matched the cyclist's description pacing the parking lot and then moving toward the victim's car right before the murder. *Id.* at 493.

The petitioner also claims that counsel was ineffective for failing to investigate a bicycle found in the yard of Steven Marcello. Marcello discovered an abandoned bicycle in his front yard on the day of the murder. Doc. 23, att. 2, pp. 227–28. After learning that the bicycle matched the description of the one seen at the crime scene, Marcello informed the Jefferson Parish Sheriff's Office. *See id.* at 227–30. The petitioner contends that counsel should have shown photographs of this bicycle to witnesses in order to ascertain whether it was the one spotted at the crime scene.

However, the petitioner does not show where the prosecution put forth any evidence linking the bicycle recovered from Marcello's yard to the petitioner. Therefore he cannot show how exclusion of the bicycle recovered from Marcello's yard would have weakened the case against him. Accordingly, the petitioner has failed to satisfy *Strickland* under any part of this claim.

### b. *Ineffectiveness in challenging identification of petitioner as the perpetrator*

The petitioner next alleges that trial counsel performed deficiently in his challenges the video surveillance on which the prosecution partially relied to identify him as the shooter. He submits a letter from a representative of a biometrics company, who stated that the surveillance footage was not even clear enough to identify whether the shooter was male or female, let alone prove that it was the petitioner. *Id.* at 179–80. The petitioner complains that the prosecution "alluded many times during trial that the person seen in the surveillance video was the man that murdered the victim and that Petitioner was that man." Doc. 1, att. 1, p. 12. Accordingly, the petitioner contends that trial counsel ought to have secured an expert who would have testified to the fact that a reliable identification could not be made from the surveillance footage.

At trial a number of witnesses testified that they had seen a scruffy, bearded individual dressed in unseasonably warm clothing at or near the crime scene around the time of the shooting.[9]

---

[9] *See* doc. 22, att. 5, pp. 108–12 (testimony of Patricia Weidie); *id.* at 133–36 (Stanton Bundy); *id.* at 149–52 (Leonard Tubbs); *id.* at 90–94 (Spencer Harris).

The surveillance footage was also admitted as evidence. Doc. 22, att. 7, pp. 45–60. The jury had ample evidence to consider in judging the reliability of the shooter's identification and the petitioner has not shown that expert testimony on the video surveillance would have overridden the inferences they drew. This claim thus offers no basis for federal habeas relief.

### c.   Failure to object to prosecutorial misconduct

The petitioner alleges numerous instances of prosecutorial misconduct and contends that trial counsel's failure to object to these amounted to ineffective assistance.[10]

### i.       Character evidence and uncharged acts

Under the Louisiana Code Evidence, evidence of a character trait is generally inadmissible to prove that a person acted in conformity with that trait. LA. CODE EVID. art. 404(A). However, exceptions are made for criminal defendants when they place a character trait at issue and the prosecution then offers evidence to rebut that contention. *Id.* at art. 404(A)(1). Additionally, the character of a witness may be attacked by examination "concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony." *Id.* at art. 404(A)(3); *id.* at art. 607. However, attacks on a witness's character for truthfulness may only come through evidence that he has been convicted of a crime or general reputation evidence. *Id.* at arts. 608–09. Evidence of prior bad acts of a defendant may nevertheless be admissible in order to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ." *Id.* at art. 404(B).

---

[10] The petitioner alleges prosecutorial misconduct, which encompasses improper remarks by a prosecutor at trial. *E.g.*, *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007). However, many of his sub-claims actually relate to the introduction of character evidence through witness testimony. As such, we construe these sub-claims to instead be based on his attorney's failure to object to the allegedly improper introduction of character evidence.

Here the petitioner testified at trial, putting his credibility at issue. *See* doc. 23, p. 138. He alleges that trial counsel was ineffective for failing to object to or request a mistrial based on the following attacks on his character:

### 1. *Bigamy and filing a false public record regarding statements on his marriage license*

At trial the prosecution called Gwendolyn Hanhart, who was representing the victim in divorce proceedings against the petitioner, and Assistant District Attorney David Wolff, who had handled the petitioner's report that the victim assaulted him a month before the murder as well as the victim's request for a restraining order against her ex-husband, Peter Caruso. *See* doc. 22, att. 4, pp. 107–08; *id.* at 134–145. Hanhart testified that she had checked the records of the petitioner's previous marriage to Andrea Marinello and discovered that the petitioner was not yet divorced from Andrea at the time he married the victim. *Id.* at 116–18. She also testified that she informed the victim of this fact the month before the murder and then filed an amended pleading on the victim's behalf, alleging that the marriage was a nullity. *Id.* at 123–24. Wolff testified that, in the context of handling the petitioner's assault allegations, he learned that an allegation of bigamy had been made against the petitioner and investigated it for himself. *Id.* at 147–49. He then called the petitioner to let him know that "things are getting nasty" and that his wife was "now telling people that [he is] a bigamist." *Id.* at 151–52. The prosecutor also asked the petitioner on cross-examination about the bigamy allegations. Doc. 23, pp. 254–56. The petitioner admitted that he knew about the bigamy allegations and that he "wouldn't put it past me [*sic*]" that the victim would disclose these allegations to the media. *Id.* at 283.

Here the bigamy allegations are relevant under Article 404(B) to show the petitioner's motive for murdering the victim insofar as petitioner's status as a local celebrity could be compromised or tarnished by revelation of that fact. This relevance can be surmised from the

prosecutor's opening and closing arguments.[11] Thus there was no basis for an objection to the testimony of Hanhart or Wolff, nor to the topic being brought up in cross-examination. Thus the petitioner has not shown deficient performance in this matter.

### 2. *FEMA fraud/Donations from coworkers*

On cross-examination the prosecutor asked the petitioner if he had received money from FEMA to rehabilitate a property that was actually owned by his ex-wife, Andrea Marinello. Doc. 23, pp. 256–59.[12] There is no record that the petitioner was convicted of any crime for this matter and no indication that the FEMA fraud allegations specifically refuted anything in the petitioner's testimony.[13] Accordingly, as shown *supra*, this line of questioning would be inadmissible to attack the petitioner's credibility. Furthermore, although the prosecution referenced the petitioner's money troubles, it does not appear that they attempted to establish it as a motive for the murder. Thus the trial attorney's failure to object might have constituted deficient performance.

Even so, petitioner fails to show adequate prejudice from admission of the testimony that resulted. The evidence against him, as summed up by the Third Circuit, was overwhelming. It included the acrimonious divorce proceedings between the petitioner and the victim, the petitioner's knowledge that the victim would be at the site where she was shot on the relevant date,

---

[11] In his opening statement the prosecutor drew attention to the petitioner's "big ego" and stated that he was "very protective of his reputation within the community, one that he perceived to be extremely special." Doc. 22, att. 3, p. 191. He also noted that the bigamy allegations were placed into the public record when Hanhart filed the amended petition on the victim's behalf. *Id.* at 194. At closing, the prosecutor pointed out that he was not required to prove motive but that "we have proved numerous motives causing the defendant, in his mind any way [*sic*], to kill Mary Elizabeth Marinello . . . ." Doc. 23, att. 1, p. 155. He then recalled that Hanhart called the police after learning the victim's identity to inform them of "the proceedings, about the divorce into an annulment and about the bigamy." *Id.* at 158. He further asserted that the petitioner "couldn't stand that [the victim] had outed him as a bigamist. . . . Anger, retribution. That's Vinny." *Id.* at 168.

[12] Neither party provides citations to the testimony relating to donations from coworkers. For the sake of argument, we assume that this topic was also raised by the prosecution at some point and that the defense did not object.

[13] The petitioner also alleges that the prosecution failed to provide notice of their intent to offer evidence of FEMA fraud under LA. CODE EVID. art. 404(B). However, he does not indicate where the prosecution introduced any evidence of the FEMA fraud at trial. He also provides no citation to the notice which he claims only referenced the bigamy evidence. For the sake of argument, however, we assume that this allegation is well-founded and that there was an additional basis for an objection.

the fact that the shooter was sighted driving the same make and model of vehicle then driven by the petitioner, cell phone records placing the petitioner in the vicinity of the crime scene and undermining his alibi, a checklist of evidence found at the petitioner's trailer which included details not then known to police, gunshot residue in the petitioner's vehicle, and testimony that the petitioner had purchased a fake mustache and the same kind of rare ammunition used in the crime shortly before the murder. *Marinello*, 49 So.3d at 493–99. Accordingly, whatever injury the petitioner's credibility suffered as a result of these allegations is insufficient to satisfy the second prong of *Strickland*.

### 3.  *Baldness and vanity*

On cross-examination the prosecution asked the petitioner about his use of a toupee. Doc. 23, att. 1, p. 44. The petitioner contends that this matter's only relevance was to ridicule him in the eyes of the jury. However, the prosecution followed up by asking him whether he was also unable to grow facial hair. *Id.* As the ensuing questions showed, this matter was relevant to the shooter's use of facial hair as a disguise and the petitioner's admission that he had purchased a fake mustache. *Id.* at 44–47. Accordingly, there was no deficient performance in trial counsel's failure to object to this line of questioning.

The petitioner also maintains that his attorney should have objected to the prosecution's attempt to characterize him as a vain person during opening argument.[14] He contends that the

---

[14] In his opening statement the prosecutor said the following:

> Now, in order for you ladies and gentlemen to understand who Vince Marinello is and why we're here today, you have to understand first who he was. Back in the days before cable television became popular and accessible to all, Vince Marinello was a television sportscaster at a local TV station. He was, by all accounts, quite popular with his audience, and in part, that was because he was a local New Orleanian, someone that the people in the city could relate to and that he had a knack for connecting with people.
>
> Later, as he was replaced by newer and fresher faces, he found himself . . . demoted to [AM] radio, and although his star was steadily fading, he maintained employment doing late night radio shows presenting himself as a likeable fellow and a great story teller. Everyone who knew Vince Marinello knew that he had a big ego. He was always very protective of his reputation within

prosecution put on no evidence to support this characterization, and that it was irrelevant as his vanity did not relate to his credibility was a witness.

The Louisiana Code of Criminal Procedure establishes the scope of the prosecution's opening statement as "explain[ing] the nature of the charge, and set[ting] forth, in general terms, the nature of the evidence by which the state expects to prove the charge." LA. CODE CR. P. art. 766. As the respondent points out, the prosecution's reference to the petitioner's vanity was supported by the testimony of the petitioner's coworker, Todd Menesses, that the petitioner "always dressed . . . to the 9's." Doc. 22, att. 4, p. 264. Menesses went on to establish some of the relevance of this trait, as he encountered the petitioner shortly before the murder and recalled that he was dressed "like a hobo," a marked contrast from his usual appearance. *Id.* at 265. The relevance was also established through the prosecution's contention, reflected in the testimony of Wolff and Hanhart and cross-examination of the petitioner, that the murder was motivated by the petitioner's fear that the victim would make her bigamy allegations against him known to the public, thus sully his self-perceived reputation (as argued by the prosecution) as described *supra* under claim (c)(i)(1).[15]

Accordingly, the petitioner has not shown any grounds for objection to this statement and does not satisfy the first prong of *Strickland*.

---

the community, one that he perceived to be extremely special. He was a vain person; he always dressed to the nines. And he purported to have a lot of money. No financial troubles whatsoever at all.

Doc. 22, att. 3, pp. 191–92

[15] The petitioner contends that evidence relating to his motive was irrelevant, as motive is not an element of the charged offense. This only means that the prosecution is not required to prove motive beyond a reasonable doubt. The relevance of showing motive to any crime, however, is plain as it relates to identification of the perpetrator and, in the case of second degree murder, his intent to commit the act. *See, e.g.*, *State v. Sutfield*, 354 So.2d 1334, 1337 (La. 1978) ("In order to have independent relevance, the motive established by other crimes must be more than a general one . . . it must be a motive factually peculiar to the victim and the charged crime."); FED. R. EVID. 404(B) & LA. CODE EVID. art. 404(B) (both allowing for admission of evidence of other bad acts by a criminal defendant to show, among other things, motive).

#### 4.   *Mafia references*

At trial David Selmo, who had done construction work on the petitioner's house, testified that the petitioner once commented on the type of weapons favored by assassins, volunteered an anecdote about a local Mafia hitman, and then showed Selmo his gun. Doc. 22, att. 6, pp. 256–60. The prosecution asked the petitioner about the Mafia and the conversation with Selmo. Doc. 23, p. 266. After the petitioner denied even knowing what the Mafia was, the prosecution pushed on, asking about a book and magazine on Mafia figures recovered from the petitioner's home. *Id.* at 267–68. During closing argument the prosecutor also brought up the fact that the victim was shot twice in the face, then added, "In the mob life what does that mean? Shoot them two times in the face, why. It is personal, and you don't want them to have an open casket." Doc. 23, att. 1, p. 211.

Although the testimony above appears improperly prejudicial and irrelevant, and the prosecutor's statements may amount to prosecutorial misconduct, the petitioner again fails to show adequate harm. The prosecution introduced no evidence to support the notion that the petitioner had anything other than a passive fascination with the Mafia. There is no reason to believe that these insinuations made any difference to the mountain of evidence against the petitioner. Accordingly, the petitioner is not entitled to relief under this portion of the claim.

#### ii.   *Statements during closing argument*

The petitioner points to several other statements by the prosecutors at closing argument, alleging that his counsel's failure to object to these amounted to ineffective assistance. The petitioner first challenges the fact that the prosecutor made attacks on his character.

Article 774 of the Louisiana Code of Criminal Procedure provides the scope of argument as follows:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw

therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice.

All statements bearing on the petitioner's character for truthfulness were properly admitted as the petitioner placed his credibility at issue by testifying. Therefore the petitioner's attorney did not perform deficiently by failing to object to these statements.

The allusion to "mob life," referenced above, could be viewed as prejudicial; however, the prosecutor's insinuations appear to only relate to petitioner's apparent fascination and willingness to discuss the subject with others – not to any actual ties with organized crime. Accordingly, the petitioner cannot satisfy *Strickland*'s second prong with respect to that statement.

The petitioner next points to several statements describing how the shooting played out, what the surveillance footage showed, and the substance of witness testimony, which he contends rested on facts not in evidence. However, the petitioner does not refute that these were fairly drawn inferences from the voluminous testimony and other evidence. Accordingly, he has not shown deficient performance by trial counsel in failing to object to any of these statements.

Finally, the petitioner complains that the prosecutor made the following statements:

> "A murder is a murder wherever it takes place, and it is just as important to the people of Lafayette as it is to the people of New Orleans and Jefferson Parish."

> "She has no reason to come in here and lie. She doesn't know the defendant from Adam, but she came in here and told you what she saw on those four days. And remember, this goes for all the witnesses that came here."

> "Allen Reese is a hero, not a murderer, so consider that when you decide who you are going to believe; a hero or a murderer."

Doc. 1, att. 1, p. 21.[16]

---

[16] The petitioner provides citations to these statements, but they do not align with the contents of the record. For the sake of argument, we assume these are accurate representations of what the prosecutor said.

While the second statement appears proper, the first and third (to the extent it implies special knowledge about Reese's character) potentially exceed the permissible scope of closing argument.[17] However, a conviction based on improper remarks during argument will not be reversed unless the court is "thoroughly convinced that the remarks influenced the jury and contributed to the verdict . . . ." *State v. Harris*, 892 So.2d 1238, 1255 (La. 2005). Furthermore, "[c]redit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence."[18] *State v. Kyles*, 513 So.2d 265, 276 (La. 1987).

The petitioner fails to show that this brief statement had any influence on the verdict. Accordingly, counsel's failure to object did not deprive him of a different verdict or the opportunity for reversal upon review and this portion of the claim cannot satisfy the second prong of *Strickland*.

### iii.  Using gun as a demonstrative aid

The petitioner next complains that trial counsel failed to object or move for a mistrial when the prosecutor used a .38 caliber gun[19] as a demonstrative aid during his cross-examination of the petitioner. *See* doc. 23, att. 1, p. 54. The prosecutor never stated that the gun placed before the petitioner was the actual murder weapon. Instead, he stated that the petitioner could put the gun in his hand and then commented that he looked comfortable with it. *Id.* This invitation came after the

---

[17] *Compare State v. Sayles*, 395 So.2d 695, 697 (La. 1981) ("Argument on the credibility of a witness is proper where facts bearing on the witness' credibility appear in the record.") *with State v. Smith*, 131 So.2d 676, 681 (La. 1989) ("[I]t has consistently been held to be reversible error for the prosecutor to express his belief in . . . the credibility of a key witness, where doing so implies that he has additional knowledge or information about the case which has not been disclosed to the jury."); *see State v. Sugar*, 408 So.2d 1329, 1331 (La. 1982) (prosecutor may not turn the closing argument into a plebiscite on crime).

[18] *See also Little v. Johnson*, 162 F.3d 855, 861 n. 7 (5th Cir. 1998) (To obtain habeas relief based on prosecutor's prejudicial remarks, petitioner must show that the remarks were such a "crucial, critical, or highly significant factor" that it is reasonably probable that the verdict would have been different in their absence.) (internal alterations omitted).

[19] The prosecution had already put on ballistics evidence that a .38 caliber gun was the murder weapon. Doc. 22, p. 53. A friend of the petitioner testified that he had given the petitioner a .38 caliber handgun as a gift. Doc. 21, att. 5, pp. 44–46. David Selmo also testified that the petitioner had shown him a .38 caliber handgun during their conversation about hitmen. Doc. 22, att. 6, p. 260.

prosecutor raised the fact that, in earlier statements, the petitioner had denied ever firing a gun despite the fact that another witness had testified that the petitioner had taken a .38 caliber gun in for test firing a month before the murder. *Id.* at 53.

The petitioner provides no grounds for an objection or a mistrial based on this exchange. Indeed, the probative value based on the petitioner's prior denials and the centrality of a .38 caliber gun to the case clearly outweighs any prejudice. Accordingly, there was no deficient performance in trial counsel's failure to object.

### d.   Use of investigator

The petitioner also claims that trial counsel was ineffective in his use of investigator Frank Mistretta. He contends that trial counsel should have (i) allowed Mistretta to testify on information gleaned from an interview with witness James Rizzuto, (ii) called him as an expert witness on the checklist found in the petitioner's residence, (iii) used him to investigate witnesses at the Metairie Academy, and (iv) had him in the courtroom at trial.

### i.   James Rizzuto

Rizzuto, a theatrical makeup artist who worked at the Vieux Carre Hair Shop, was called as a witness by the prosecution. Doc. 22, att. 4, p. 292. He testified that he sold the petitioner a fake mustache on August 22, 2006. *Id.* at 294–97. He also stated that he asked the petitioner whether he needed spirit gum or a fake beard to go with the mustache, and the petitioner stated that he already had those items. *Id.* at 298.

The petitioner relies on an affidavit from Mistretta, attached to his state application for post-conviction relief, to show that trial counsel should have called Mistretta as a witness to impeach Rizzuto's testimony. There Mistretta stated that he had interviewed Rizzuto prior to trial, and that Rizzuto (1) "agreed with Mistretta that a person could purchase far more items that would

disguise a persons [*sic*] identity" and (2) stated that "no interest in a beard [was shown] by Mr. Marinello." Doc. 23, att. 2, pp. 201–02.

The information provided in the affidavit does not contradict Rizzuto's testimony and the topic of what other items could have been purchased to disguise a person's experience could have been raised on cross-examination if trial counsel had seen fit.[20] Accordingly, no deficient performance is shown through this part of the claim.

###### *ii.*    *Checklist*

The petitioner claims that Mistretta could have offered an expert opinion, based on his experience as a homicide detective, on the checklist found at the petitioner's trailer. The Mistretta affidavit summarizes his findings on the checklist as follows:

> Investigator also reviewed the note seized from Vincent Marinello's FEMA trailer on Germaine Street in New Orleans in accordance with the execution of a search warrant. This not was [*sic*] dubbed a "To Do List." When examined it appeared to Mistretta that it was a list of items, circumstances, and facts that Mr. Marinello believed that the police may have believed they had pointing to his involvement in the murder of Liz Marinello.

*Id.* at 202. The affidavit goes on to briefly summarize some of the items on the list and appears to refute the item about disposal of the gun ("Gun – River on way to Mama"), noting that there was not a river next to Marinello's mother's residence. *Id.* However the petitioner admitted at trial that "Mama" as used on the list referred to his friend, Annette Daniels, whose house he visited on the evening after the shooting. Doc. 23, pp. 238–39.

The petitioner's testimony also reveals that there were numerous other items on the list that were not referenced or refuted by the Mistretta affidavit. *Compare id.* at 236–52 *with* doc. 23, att.

---

[20] Trial counsel's failure to raise this topic does not appear to be deficient performance, either. As stated above, witnesses testified that the shooter had facial hair and dressed in unseasonably warm clothes. There was no indication that the shooter used any other disguise elements that the petitioner did not purchase or claim to already have in his possession.

2, p. 202. The petitioner does not show how Mistretta could have offered better explanations for these items than the petitioner did at trial, based on his personal experience in drafting the list. Accordingly, he fails to show deficient performance by trial counsel in this matter.

### iii.        Witnesses at Metairie Academy

Lauren White, a substitute and cheerleading coach at Metairie Academy for Advanced Studies at the time of the murder, testified at trial that she had seen a man later identified as the shooter bicycling around the area on the afternoon of the murder and the three preceding afternoons. Doc. 22, att. 5, pp. 43–47. She stated that she remembered the man's eyes and recognized him as Vincent Marinello once news of the shooting and Marinello's photograph were publicized. *Id.* at 47–50.  The petitioner claims that trial counsel was ineffective for not using Mistretta to interview the students and other staff member who were with White on the afternoons she observed the shooter. He alleges that the students were closer to the shooter, and even interacted with him, and that they would thus support his claim that he was not the shooter.

White admitted that the students told the shooter hello and that he acknowledged them. Doc. 22, att. 5, p. 46. However, she never stated that they and/or her coworker were closer to the shooter. She also testified that she paid particular attention to the shooter's face, out of concern for the safety of her students. *Id.* at 47. As the trial court noted, the petitioner's claims that the other potential witnesses at Metairie Academy would have been in a better position to identify the shooter are merely speculative. Accordingly, he cannot satisfy either prong of *Strickland* through this claim.

### iv.        Failure to have Mistretta in the courtroom

The petitioner also claims that trial counsel performed deficiently by failing to have Mistretta in the courtroom during trial.

The petitioner alleges that Mistretta had "a wealth of information at his disposal" that could have been used to impeach witnesses or otherwise guide trial counsel. Doc. 1, att. 1, p. 37. The petitioner insists that the "[p]rejudice is automatic when the person who is most knowledgeable about your case is not even in the courtroom to advise counsel." *Id.*

We disagree. The petitioner fails to identify a single piece of information known to Mistretta and not trial counsel, much less where and how this information could have been used at trial. Therefore we cannot determine from the information provided whether not having Mistretta in the courtroom was deficient performance or whether the petitioner was sufficiently prejudiced thereby.  The petitioner fails to satisfy *Strickland* under any part of this claim and is therefore not entitled to federal habeas relief.

### e.  Failure to investigate alternate suspect

The petitioner alleges that trial counsel was ineffective for failing to investigate Peter Caruso, ex-husband of the victim, as a suspect. He contends that counsel failed to ascertain that Caruso had an alibi before pointing to him as an alternate suspect at trial, thereby making the defense appear desperate and foolish in the eyes of the jury.

The record reflects that Caruso, a court reporter, was in a deposition in New Orleans from 2:09 pm until 4:17 pm. Doc. 22, att. 3, p. 261; doc. 22, att. 4, pp. 56–58. Given that the time of the murder was fixed at 3:57 pm, Caruso did not appear to be a viable suspect in the death of Liz Marinello.

However, as respondent points out, the petitioner mischaracterizes the defense's argument. The defense did not attempt to identify Caruso as the murderer. Rather, it tried to show that the police focused on the petitioner to the exclusion of other likely suspects from the outset of the case – that the investigation "followed Vince, instead of following the evidence." Doc. 23, att. 1, pp.

176, 181–82, 185. In this vein, trial counsel implied that the police disregarded other theories of the case and evidence that might have exculpated the petitioner. *See id.* at 174–201. Accordingly, petitioner does not show deficient performance under this claim.

### f.   *Expert identification opinion of Dax Russo*

Sergeant Dax Russo, a detective with the Jefferson Parish Sheriff's Office, recovered surveillance footage of the crime scene. Doc. 22, att. 7, pp. 39–41. He explained the compilation of footage and stills offered as evidence by the prosecution. *Id.* at 41–45. As the prosecution played a presentation of footage and stills created by Russo, Russo identified the victim and the shooter within the presentation. *Id.* at 47–58. He also identified a white Ford Taurus within the footage. *Id.* at 51–52.

The petitioner alleges that trial counsel should have objected to and moved for a mistrial based on the "expert identification opinions" offered by Sergeant Dax Russo. However, as the respondent points out and the petitioner admits, Russo was never qualified as an expert. *See* doc. 22, att. 7, pp. 39–60. Under Louisiana law, a lay witness may offer opinions, rationally based on his perception, as long as they are "[h]elpful to a clear understanding of his testimony or the determination of a fact at issue." LA. CODE EVID. art. 701.

The petitioner also contends that trial counsel should have attacked Russo's identification of a vehicle and the victim as well as his failure to offer any footage of the shooter leaving the crime scene. Russo had stated that he believed the vehicle captured in the surveillance footage was a white Ford Taurus. Doc. 22, att. 7, p. 62. He stated that this opinion was based on comparisons with that vehicle model and that no comparison was done with any other make or model of vehicle. *Id.* at 62–63. He also conceded that he was not an expert on vehicle identification and had no

particular training in that area. *Id.* Accordingly, his opinion was rationally based on his own perception and no representation of expertise was given to that opinion.

Meanwhile, the forensics report that petitioner claims would have contradicted Russo's opinion instead shows that the analyst compared the vehicle in the surveillance footage to a 2006 Ford Taurus and "could not find any unexplainable differences between the class characteristics" of a Ford Taurus and the vehicle shown in the surveillance footage. Doc. 23, att. 2, pp. 209–10. The petitioner fails to show grounds for an objection on this matter.

Russo also offered his opinion that a figure in the surveillance footage was the victim and that, in a certain still, an elongated pixel in a frame represented the victim lying on the ground after the shooting. Doc. 22, att. 7, pp. 47–49. As respondent notes, this identification was not an expert deciphering of a pixel but instead based on Russo's perception after viewing all surveillance footage of the shooting and his knowledge of where the victim was ultimately found by first responders. *See id.* at 40–49. Again, Russo never offered an expert opinion on this matter and the petitioner presents nothing to undermine his lay opinion. Furthermore, the petitioner fails to show how contesting the identification of the victim in that footage would have supported his claim that he was not the shooter.

Finally, the petitioner claims that trial counsel should have challenged Russo over the fact that the shooter was never depicted leaving the parking lot in the surveillance footage. The petitioner alleges that, contrary to the trial court's findings, there were cameras positioned to provide surveillance footage of the entire parking lot where the shooting occurred. Doc. 1, att. 1, pp. 45–46. However, he offers no citations for these assertions. Meanwhile, Russo testified that, although nine cameras were fixed on the parking lot where the crime occurred, the surveillance input system "only [recorded] one image from each camera separately at a time," in a random

order. Doc. 22, att. 7, p. 50. Accordingly, there is no basis for determining that grounds existed to challenge Russo's testimony or the prosecution's theory of the crime in this regard.

The petitioner thus fails to satisfy *Strickland* under any part of this claim.

### g.   Bullet fragment

The petitioner next claims that trial counsel performed deficiently when he delayed having a bullet fragment dug out of the petitioner's yard. The petitioner alleges that testing the bullet would have supported the petitioner's claim that the gunpowder residue in his car was caused by his recent test firing of a 9 millimeter gun just over three weeks before the murder. However, the petitioner fails to show that the bullet was ever tested and that these results did in fact support his claim. Accordingly, his allegations are merely speculative and insufficient to satisfy *Strickland*.

### h.   Voir dire

The petitioner's final allegation of deficient performance relates to trial counsel's performance during voir dire. He alleges, with no specification, citation to the record, or other evidence, that trial counsel allowed unqualified jurors to serve and failed to object to the prosecution's alleged use of peremptory strikes based on race and gender. His vague and self-serving allegations are thus insufficient to satisfy *Strickland*.

### i.   Cumulative error

Lastly, the petitioner alleges that the cumulative effect of the above errors amounted to sufficient prejudice in satisfaction of *Strickland*. However, in each of the above claims where we found that trial counsel might have performed deficiently, the petitioner failed to show any harm to his case. Accordingly, the aggregate of this harm is still insufficient to satisfy *Strickland's* second prong in light of the overwhelming evidence against him. The petitioner has not shown any right to federal habeas relief on his ineffective assistance claims.

### 2. *Lack of evidentiary hearing*

The petitioner contends that his constitutional rights were violated when the trial court failed to grant an evidentiary hearing on his state application for collateral review.

Federal habeas relief is only available to petitioners in state custody if they are confined "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). It is well established that this court's deference to a state court's factual determinations does not depend upon the existence of an evidentiary hearing in the state courts. *Valdez v. Cockrell*, 274 F.3d 941, 949–51 (5th Cir. 2001). Furthermore, the lack of an evidentiary hearing in state court does not prevent a petitioner seeking relief under § 2254 from requesting one on federal review. *See Murphy v. Johnson*, 205 F.3d 809, 815–16 (5th Cir. 2000). The petitioner did not request an evidentiary hearing on any part of his federal petition. Therefore the denial of an evidentiary hearing by the trial court does not impact our standard of review, nor does it show that the petitioner is in custody in violation of federal law. Accordingly, the petitioner shows no right to relief under this claim.

## IV.
### CONCLUSION

The petitioner has not shown that he is entitled to relief under any claim. Accordingly, **IT IS RECOMMENDED** that the instant application be **DENIED** and **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court.  Timely objections will be considered by the district judge prior to a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429–30 (5th Cir.  1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.  *See* 28 U.S.C. § 2253(c)(2).  A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE AND SIGNED in Chambers this 11th day of August, 2016.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE